



FILED
2023 Mar-10  PM 12:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

WADE HARRIS, et al.,               )
                                   )
    Plaintiffs,          )
                                   )
    v.                   )     Case No. 5:21-cv-00344-NAD
                                   )
UNIVERSAL PROPERTY AND             )
CASUALTY INSURANCE                 )
COMPANY, et al.,                   )
                                   )
    Defendants.          )

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

For the reasons stated below and on the record in the January 18, 2023 motion hearing, the motion for partial summary judgment filed by Defendants Universal Property and Casualty Insurance Company and Alder Adjusting Corporation (Doc. 33) is **GRANTED**. The claim for bad faith failure to pay and investigate alleged by Plaintiffs Wade and Nicole Harris is **DISMISSED WITH PREJUDICE**. *See* Doc. 1 at 17–18 (Count 6 in the Plaintiff Harrises' complaint).

## BACKGROUND

Roughly a year and a half after a pipe burst and flooding damaged the Plaintiff Harrises' residential property, the Harrises filed a complaint in state court against

Defendants Universal and Alder Adjusting (collectively, "Universal"),[1] alleging 6 claims for relief:   misrepresentation (Count 1), suppression (Count 2), negligent/wanton failure to procure (Count 3), negligent/wanton training and supervision (Count 4), breach of contract (Count 5), and bad faith failure to pay and investigate (Count 6).   Doc. 1 at 7–18; Doc. 39 at 2.   After removing the case to this court (Doc. 1), Universal moved for summary judgment on all of the Harrises' claims except the claim for breach of contract (Count 5).   Doc. 33.

In their opposition to Universal's partial summary judgment motion, the Harrises withdrew the claims that they had alleged in Counts 1, 2, 3, and 4 of the complaint (Doc. 39 at 2), each of which then was dismissed with prejudice (Doc. 43).

As a result, only the Harrises' bad faith claim (Count 6) is at issue on this partial summary judgment motion.

### A.    Factual background

Generally speaking, the material facts are undisputed.   The court here summarizes the relevant timeline:

The Harrises own a residential property located in Decatur, Alabama.   Doc. 35-1 at 2.   The property was covered by a homeowners insurance policy that

---

[1] Defendant Alder Adjusting is a subsidiary of Defendant Universal.   Doc. 35-2 at 4.

Universal issued in 2018.   Doc. 35-1.   The Harrises properly and timely paid their premiums for the policy such that the policy did not lapse.   Doc. 35-2 at 8.

The policy includes "duties after loss" provisions, stating that Universal has no duty to provide coverage if the Harrises do not comply with specified duties, including a duty to provide Universal with requested records and documents.   Doc. 35-1 at 20.   Specifically, the provision states in relevant part:   "In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us.   These duties must be performed either by you, an 'insured' seeking coverage, or a representative of either."   Doc. 35-1 at 20.   The specified duties include the following:   "Cooperate with us in the investigation of a claim"; "As often as we reasonably require[,] . . . [p]rovide us with records and documents we request and permit us to make copies"; and, "Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief: . . . [s]pecifications of damaged buildings and detailed repair estimates."   Doc. 35-1 at 20.

On or about May 4, 2019 (and as noted above), the Harrises' property sustained damage from flooding after a pipe burst.   Doc. 35-3 at 2.   On May 6, 2019, the Harrises contacted Universal about the damage.   Doc. 35-3.

The next day (May 7, 2019), Universal contacted Servpro, a damage restoration company, and Servpro came out to the property.   Doc. 35-4 at 2.

3

On May 8, 2019, both Shane St. John—an adjuster for Universal—and professionals from Servpro came to the property.   Doc. 35-4 at 2.   Servpro began restoration work, and St. John submitted an estimate for the claim.   Doc. 35-4 at 2.

On May 9, 2019, Universal issued a check to the Harrises for $13,424.89, based on St. John's itemized estimate.   Doc. 35-2 at 10; Doc. 36-1; Doc. 36-2; Doc. 36-3.   Universal also sent a letter to the Harrises explaining that they potentially could recover additional funds by submitting itemized invoices and other documentation related to repairs.   Doc. 36-4.

On May 15, 2019, Servpro completed its initial restoration work.   Doc. 35-4 at 5.   In June 2019, Universal paid Servpro $2,898.62 for the restoration work. Doc. 35-2 at 10.

Also in June 2019, Mr. Harris contacted Universal, requesting documents and seeking coverage for additional damage and repairs.   Doc. 36-6; Doc. 36-7.   A representative from Universal told Mr. Harris that he needed to submit itemized invoices to receive coverage for the additional damage and repairs.   Doc. 36-7.

On June 17, 2019, Universal sent the Harrises a letter stating that their claim for supplemental damage coverage was being denied because of their failure to submit line-item cost estimates, including estimated costs for materials and labor. Doc. 35-2 at 16–17; Doc. 36-8.

On July 24, 2019, Mr. Harris called Universal to say that he had not received

4

the initial insurance check, and that he had not received adequate compensation for the damage to the property.   Doc. 36-10.   Universal mailed the Harrises a new check, and Mr. Harris was told that he needed to send an itemized invoice for redetermination of the value of the damage to the property.   Doc. 36-10.

In September 2019, Ms. Harris sent an email to Universal, stating that the Harrises had not received adequate compensation, and that the property had developed mold.   Doc. 36-12.

On September 18, 2019, Jenny Fernandez—a claims examiner for Universal—attempted to call the Harrises; their voicemail was full, so she sent them an email.   Doc. 36-12; Doc. 35-2 at 14.   After Fernandez held a conference call with the Harrises and a contractor (Bobby Young), Universal issued another check to the Harrises for $12,160.98 based on Young's estimates.   Doc. 37-1; Doc. 36-14; Doc. 36-15; Doc. 35-2 at 10.   The following day, the Harrises were emailed a property inventory form to fill out and a routing number so that they could track delivery of the insurance checks (both the initial payment, which still had not been received, and the supplemental payment).   Doc. 36-14; Doc. 37-2.

On September 27, 2019, Ms. Harris requested that Universal provide documents to the Harrises' mortgage company.   Doc. 37-4.   The same day, Mr. Harris confirmed that the documents had been received, and told Universal that he still was working on obtaining an estimate for repairs to the kitchen.   Doc. 37-6.

On September 30, 2019, Ms. Harris asked Fernandez if she had received a repair estimate (apparently from a contractor named Michael Grantland); Fernandez replied that she had not.   Doc. 37-7.   On October 1, 2019, Ms. Harris sent an email about a partial estimate for painting, but Fernandez noted that the email did not have an attachment.   Doc. 37-8; Doc. 37-9.

On October 10, 2019, Ms. Harris emailed Fernandez photographs of the kitchen.   Doc. 37-10.   Fernandez tried to contact the Harrises but could not reach them.   Doc. 37-13; Doc. 37-14.

On October 29, 2019, Fernandez spoke to the Harrises and retained James Hindman of Belfor Property to provide a cost estimate for any remaining repairs to the property.   Doc. 37-15; Doc. 37-16.   On November 27, 2019, Hindman informed Fernandez that he had not been able to get in touch with the Harrises. Doc. 37-17; Doc. 37-19.

But on December 3, 2019, Hindman confirmed an inspection date for the Harrises' home of December 5, 2019.   Doc. 37-18; Doc. 37-20.   Hindman performed the inspection on that date.   Doc. 38-1; Doc. 39-3 at 9.

On January 13, 2020, Fernandez asked Hindman when to expect a report, and Hindman said he would submit the report in a few days.   Doc. 38-3.

On January 20, 2020, no report had been received, and the Harrises contacted Fernandez, threatening to hire a lawyer to sue for bad faith.   Doc. 38-1; Doc. 38-2.

6

On February 3, 2020, Hindman told Universal that he would be finished with the report in two days; however, no report from Hindman ever was received.   Doc. 38-3; Doc. 35-2 at 11.

On February 13, 2020, Fernandez tried to contact the Harrises but could not reach them, and could not leave them a voicemail; Fernandez then contacted the Harrises' independent insurance agent to confirm that she had their correct contact information.   Doc. 38-4; Doc. 38-5.   On February 14, 2020, Fernandez and Mr. Harris exchanged emails.   Doc. 38-7.

On February 18, 2020, the Harrises returned a call from Fernandez. Fernandez explained that, in light of the lack of any report from Hindman, Universal had "decided to reach a settlement agreement"—if the Harrises could obtain an estimate from a general contractor covering the specific repairs necessary to fix the damage to the property.   Fernandez also explained the additional living expenses (ALE) coverage available to the Harrises.   Doc. 38-8.   Mr. Harris agreed to try to send information to Fernandez about the damage and the recovery the Harrises were seeking, but stated that he was having trouble because no contractor wanted to take the job.   Doc. 38-8.   The same day, Ms. Harris requested a copy of the insurance policy.   Doc. 38-10.   Records indicate that Universal emailed Ms. Harris a copy of the policy on February 22, 2020, but the Harrises dispute receiving the policy.   Doc. 38-10; Doc. 38-9; Doc. 38-15.   Based on the record in this case, the Harrises never

submitted a claim or documentation to seek ALE coverage related to this insurance claim.   Doc. 35-2 at 8–9; Doc. 39-3 at 12.

Then, on April 16, 2020, Fernandez composed a reservation of rights letter, requesting additional information from the Harrises, and threatening to close the claim file in 10 days if the information was not received.   Doc. 38-12.   The letter was postmarked on May 1, 2020 (that is, more than 10 days after it was dated on April 16).   Doc. 38-13.   But Universal did not close the file.

On May 19, 2020, Universal received a letter of representation from an attorney (Phillip Mitchell), stating that he was representing the Harrises with respect to their insurance claim.   Doc. 38-14.   On May 26, 2020, Fernandez requested that a copy of the insurance policy be both mailed and emailed to Mitchell.   Doc. 38-11.

On June 30 and July 16, 2020, another contractor (Danny Dumas) performed two estimates related to the damage to the Harrises' property.   Doc. 38-16; Doc. 39-3 at 7; Doc. 39-5.

On August 27, 2020, Universal received from Mitchell an estimate by Danny Dumas, stating that the cost of repairs would total $93,516.63.   Doc. 38-16.   The estimate did not include itemized costs.[2]   Doc. 38-16; Doc. 35-2 at 12.

Then, on January 27, 2021, the Harrises filed this lawsuit.   Doc. 1.

---

[2] In contrast, estimates performed for Universal by both St. John and Jason Artusio (*see infra*) included itemized costs.   *See* Doc. 36-3; Doc. 38-17.

On June 14, 2021, Universal had Jason Artusio—a consultant expert from Envista Forensics—inspect the Harrises' home.   Doc. 38-17; Doc. 35-2 at 7. Artusio estimated that the damage would cost $51,723.18 to repair, and provided an itemized estimate.   Doc. 38-17.

In May 2022, the Harrises submitted an appraisal report by a designated expert, Chris Pettey, related to the pending litigation.   Doc. 39-4.   Pettey's estimate relied on a non-itemized estimate that Dumas provided in May 2022.   Doc. 39-4 at 70–78.

In addition, Universal's corporate representative testified in her deposition that Universal has not yet denied the Harrises' insurance claim because there is "still a dispute as far as" what the Harrises "believe to be as damaged and what Universal believes to be as damaged."   Doc. 35-2 at 6–7.   Universal's representative testified that it was her understanding that "additional money is going to be paid" on the Harrises' claims.[3]   Doc. 35-2 at 7.

Based on Artusio's estimate, the corporate representative testified that at least $26,237.31 remained to be paid, but she also noted that the number was fluid—the $26,237.31 number did not account for recoverable depreciation or the deductible, as repairs had not yet been performed.   Doc. 35-2 at 7.   The representative was

---

[3] Since the Harrises initiated this lawsuit, they also have filed two additional insurance claims with Universal.   Doc. 35-2 at 6; *see* Doc. 39-3 at 10–11.

asked if she was saying that "your company is not arguing that coverage does not exist," and instead that Universal was "in a[n] argument over how much coverage exists on the claims."   Doc. 35-2 at 10.   She replied, "I would say so, yeah," and stated that "we're not disputing that the[] [Harrises] have suffered a loss, . . . [we're] just disputing as to the amount owed."   Doc. 35-2 at 10.

## B.   Legal background

### 1.   Removal (diversity jurisdiction), and applicable substantive law

Universal removed this case from the Circuit Court for Morgan County, Alabama, based on diversity jurisdiction.   Doc. 1; *see* 28 U.S.C. § 1332.   When a federal district court has diversity jurisdiction over state law claims, the court must apply the substantive law of the forum state.   *McMahan v. Toto*, 256 F.3d 1120, 1132 (11th Cir. 2001) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).   Consequently, this court applies the substantive law of Alabama.

### 2.   Alabama law on bad faith related to insurance claims

Alabama law recognizes two forms of bad faith refusal to pay an insurance claim:   "normal" bad faith, and "abnormal" bad faith.   *White v. State Farm Fire & Cas., Co.*, 953 So. 2d 340, 347–48 (Ala. 2006).   "Alabama courts often refer to refusal-to-pay claims as 'normal' bad-faith claims and to failure-to-investigate claims as 'abnormal' bad-faith claims."   *Walker v. Life Ins. Co. of N. Am.*, No. 21-12493, 2023 U.S. App. LEXIS 3070, at *17 (11th Cir. Feb. 8, 2023) (published)

(citing *State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 256–58 (Ala.

2013)).[4]

To establish a "normal" bad faith claim, a plaintiff must show four elements:

(1) "an insurance contract between the parties and a breach thereof by the

defendant"; (2) "an intentional refusal to pay the insured's claim"; (3) "the absence

of any reasonably legitimate or arguable reason for that refusal (the absence of a

debatable reason)"; and (4) "the insurer's actual knowledge of the absence of any

legitimate or arguable reason."   *Brechbill*, 144 So. 3d at 257 (quoting *National Sec.*

*Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982)).

To prevail on a normal bad faith claim, "the plaintiff bears a heavy burden."

*Acceptance Ins. Co. v. Brown*, 832 So. 2d 1, 16 (Ala. 2001); *LeFevre v. Westberry*,

590 So. 2d 154, 159 (Ala. 1991) (citation omitted).   Indeed, to avoid summary

judgment on a normal bad faith claim, the plaintiff's "underlying contract claim must

be so strong that the plaintiff would be entitled to a preverdict judgment as a matter

of law."   *Jones v. Alfa Mut. Ins. Co.*, 1 So. 3d 23, 32 (Ala. 2008) (quoting *Shelter*

---

[4] "Alabama law recognizes two forms of bad faith:  'normal' and 'abnormal.'
These are not two torts but a single tort 'with different options for proof.'"   *Coleman
v. Unum Group Corp.*, 207 F. Supp. 3d 1281, 1284 (S.D. Ala. 2016) (quoting
*Brechbill*, 144 So. 3d at 257–58); *see Mutual Serv. Cas. Ins. Co. v. Henderson*, 368
F.3d 1309, 1314 (11th Cir. 2004) ("Under Alabama law, there are two methods by
which a party can establish a bad faith refusal to pay an insurance claim.   An
insurance company may be liable for either 'normal' bad faith or 'abnormal' bad
faith." (citations omitted)).

*Mut. Ins. Co. v. Barton*, 822 So. 2d 1149, 1155 (Ala. 2001)).

On an abnormal bad faith claim based on an alleged failure to investigate, a plaintiff must show "(1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim." *Simmons v. Congress Life Ins. Co.*, 791 So. 2d 371, 379 (Ala. 2000) (quoting *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 318 (Ala. 1999)).   "[I]f the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim." *Brechbill*, 144 So. 3d at 257.

Thus, on an abnormal bad faith claim, the "material question" is whether the insurer "recklessly or intentionally failed to properly investigate" the insured's "claim or to subject the results of an investigation to a cognitive evaluation." *Simmons*, 791 So. 2d at 379.

"Regardless of whether the claim is a bad-faith refusal to pay or a bad-faith refusal to investigate, the tort of bad faith requires proof of the third element, absence of legitimate reason for denial." *Brechbill*, 144 So. 3d at 258.   A plaintiff "must go beyond a mere showing of nonpayment and prove a *bad faith* nonpayment, a nonpayment without any reasonable ground for dispute." *Bowen*, 417 So. 2d at 183

(emphasis in original).   In other words, "the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim."   *Id.*

In addition, any bad faith claim requires "sufficient evidence of 'dishonest purpose' or 'breach of known duty' . . . through some motive of self-interest or ill will."   *Singleton v. State Farm Fire & Cas. Co.*, 928 So. 2d 280, 283 (Ala. 2005) (quoting *Slade*, 747 So. 2d at 318).

### C.    Procedural background

As noted above, the Harrises initiated this action in state court on January 27, 2021.   Doc. 1 at 7.   The Harrises alleged 6 claims for relief in their complaint. Doc. 1 at 14–18.   On March 5, 2021, Universal filed the notice of removal.   Doc. 1.   The parties consented to magistrate judge jurisdiction.   Doc. 9; *see* Doc. 13.

On October 11, 2022 (after the close of discovery), Universal filed the pending partial summary judgment motion.   Doc. 33.[5]   As noted above, 4 claims already have been withdrawn and dismissed with prejudice (Counts 1, 2, 3, and 4).   Doc. 39 at 2; Doc. 43.

The parties have fully briefed this partial summary judgment motion on the Harrises' bad faith claim (Count 6).   Doc. 34; Doc. 39; Doc. 41.   And, in their opposition to Universal's partial summary judgment motion, the Harrises incorporated a motion to strike Artusio as an expert witness (Doc. 39 at 13–15).   *See*

---

[5]  The Harrises' claim for breach of contract (Count 5) will be for a jury.

Doc. 44 (order denying motion to strike).   On January 18, 2023, the court held a motion hearing on the bad faith claim.   *See* Minute Entry (Entered: 01/18/2023).

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   A material fact is one that might affect the outcome of the case.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts creating a genuine dispute for trial.   *Celotex*, 477 U.S. at 324–25.   The court's job is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   *Anderson*, 477 U.S. at 248.   The court must view all evidence and draw all reasonable inferences in the nonmovant's favor.   *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a), (c).

## DISCUSSION

The court has conducted an exhaustive review of the record to determine whether there is a triable issue.   But, based on the controlling law and the record evidence, there is no triable issue of fact for a jury on the Harrises' bad faith claim.

## I.     There is no triable issue of fact on the Harrises' normal bad faith claim.

On the Harrises' normal bad faith claim, there is no triable issue of fact for a jury.   As explained above, a normal bad faith claim requires that the plaintiff's "underlying contract claim must be so strong that the plaintiff would be entitled to a preverdict judgment as a matter of law."   *Jones*, 1 So. 3d at 32.   But the Harrises have not filed a summary judgment motion on their breach of contract claim, and the record would not support judgment as a matter of law on that claim anyway. Instead (as noted above), the breach of contract claim will be for the jury. Practically speaking, the record demonstrates that the parties dispute the cost of the repairs to which the Harrises are entitled under their insurance policy, and dispute whether the Harrises complied with their relevant contractual obligations under the policy.

As a preliminary matter (and as explained above), on a normal bad faith claim, the plaintiff must show "an intentional refusal to pay the insured's claim."   *See Brechbill*, 144 So. 3d at 257.   But no jury reasonably could find that Universal has refused to pay the Harrises' insurance claim.   Instead, Universal *did* make two

separate payments to the Harrises, totaling approximately $25,000, based on estimates for repairs.   Doc. 35-2 at 10; Doc. 36-1; Doc. 36-2; Doc. 36-3; Doc. 37-1; Doc. 36-14; Doc. 36-15.   And the record shows that Universal has *not* actually issued a refusal or denial of the Harrises' insurance claim.   Universal's corporate representative testified in her deposition that the Harrises' claim has not been denied and still is open.   Doc. 35-2 at 6–7.

In this regard, the Harrises are correct that an insurer's partial payment does not necessarily preclude trial on a bad faith claim.   Doc. 39 at 8, 12–13.   As the Alabama Supreme Court has held, "it does not per se preclude a jury's consideration of an insured's bad-faith claim simply because the insurer has paid a portion of the insured's claim."   *Ex parte Alfa Mut. Ins. Co.*, 799 So. 2d 957, 964 (Ala. 2001); *see also Nationwide Mut. Ins. Co. v. Clay*, 525 So. 2d 1339, 1343 (Ala. 1987) (a partial payment alone cannot "avert liability altogether" because a "partial payment could be used simply as a guise to conceal an otherwise intentional denial of the claim").

But, without more, a plaintiff alleging bad faith cannot create a triable jury question on evidence of partial payment alone.[6]   *See, e.g.*, *Clay*, 525 So. 2d at 1343–

---

[6] The Harrises cannot create a triable issue based on the undisputed facts that Fernandez's April 16, 2020 reservation of rights letter, which included the threat to close the claim file in 10 days if the Harrises did not reply, was postmarked on May 1, 2020 (i.e., more than 10 days after it was dated).   Doc. 39 at 5; *see* Doc. 38-12; Doc. 38-13.   As discussed above in text, it also is undisputed that Universal did not close the claim file, despite not having received a response in the 10-day timeframe stated in the letter.

44 ("The cases cited by [the defendant insurer] in support of its argument that partial payment exempted it from liability for bad faith are all distinguishable from the present case in one respect:   in each of those decisions, the Court found no evidence of bad faith in the refusal to pay a claim.").

Next, the Harrises assert that a jury could find an intentional refusal to "fully" pay the claim based on Universal's delay in making what the Harrises would consider to be "full[]" payment—or at least additional payment(s) over and above the approximately $25,000 already paid.   Doc. 39 at 12–13.[7]

But (again), the parties dispute the cost of the repairs and the amount of what would be a hypothetical "full" payment or additional partial payment.   As explained above, the relevant insurance policy includes duties after loss provisions, pursuant to which Universal was not required to provide coverage if the Harrises did not provide Universal with requested records and documents.   Doc. 35-1 at 20.   And the undisputed record evidence shows that Universal repeatedly requested itemized estimates and invoices for repairs, but the Harrises never provided the requested documents.   Doc. 36-4; Doc. 36-7; Doc. 35-2 at 16–17; Doc. 36-8; Doc. 36-10.

While Universal's corporate representative testified in her deposition that

---

[7] Under certain circumstances, a plaintiff alleging bad faith can prove a constructive denial of a claim "by showing that the passage of time is so great that the delay alone creates a denial."   *Congress Life Ins. Co. v. Barstow*, 799 So. 2d 931, 938 (Ala. 2001).

"additional money is going to be paid" to the Harrises (Doc. 35-2 at 7), the parties still dispute that amount. *Even* Universal's estimate (from Artusio) that at least $26,237.31 remains to be paid to the Harrises for repairs still does not provide a definitive amount, *even* for a partial payment; Artusio's estimated amount did not (and cannot) account for "recoverable depreciation and the insureds' deductible" because repairs had not yet been performed. Doc. 35-2 at 7.[8] Thus, even construing the evidence and reasonable inferences in the Harrises' favor, their insurance claim remains open because the parties dispute the amount of additional payment owed; so, no reasonable jury could find that there has been a final denial of payment, constructive or otherwise.

Moreover, there can be no jury question based on any delay in Universal's "fully" making payment in this case,[9] because there is no indication in the record that any delay in payment to the Harrises was because of anything other than an ongoing dispute about the value of their insurance claim. Construing the evidence

---

[8] In their opposition brief, the Harrises note their own disagreement with Artusio's estimate. *See* Doc. 39 at 8 ("[Universal] ha[s] paid nothing since [the second payment], even in light of their own estimator's [Artusio's] report," which they note contains "(an amount the Plaintiffs do not agree with).").

[9] The Harrises argue that a jury could find bad faith based on "examples of [Universal's] intentional failure to investigate and *fully* pay Plaintiffs' claims." Doc. 39 at 12 (emphasis added). But (as discussed above in text), the amount of any hypothetical "full[]" payment is disputed, and will be for a jury on the Harrises' breach of contract claim.

in the Harrises' favor, there are no record facts from which a jury reasonably could find or infer that Universal's delay in "fully pay[ing]" the claim (or even making any additional payment) was because of a bad faith "dishonest purpose," "self-interest," or "ill-will."  *See, e.g.*, *Brechbill*, 134 So. 3d at 259–60 ("Bad faith, then, is not simply bad judgment or negligence.  It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will." (quoting *Gulf Atl. Life Ins. Co. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981))).

The district court decision in *Hand v. Allstate Insurance Co.* is illustrative. *See* No. 6:19-CV-00453-LSC, 2021 WL 2867034 (N.D. Ala. July 8, 2021) (denying in relevant part the defendant insurer's summary judgment motion on the plaintiffs' normal bad faith claim).  In *Hand*, it was undisputed that the insurer owed the insured a supplemental payment of approximately $25,000, and that the insurer had delayed paying that undisputed amount for more than 2 years.   2021 WL 2867034, at *4.  According to the district court, the insurer "hadn't paid nearly $25,000 in *undisputed* claims," and the "two-year delay in payment likely would have amounted to a constructive denial."  *Id.* (emphasis added) (citing *Congress Life Ins. Co. v. Barstow*, 799 So. 2d 931, 938 (Ala. 2001)).

Here, unlike in *Hand*, Universal has made partial payments, and has not delayed payment of any *undisputed* amount.   While the Harrises maintain that they

19

are entitled to some amount of additional payment (and Universal's corporate representative concedes as much), the parties still *dispute* the cost of the repairs and the amount of insurance coverage. *See, e.g.*, Doc. 39 at 8. So, no reasonable jury could find that Universal has delayed payment of any *undisputed* amount. And, neither the Harrises nor this court has been able to identify any authority suggesting that, without more, a jury could find bad faith based on an insurer's failure to make piecemeal payments (after initial partial payments) while the cost of repairs and the amount of insurance coverage still are *disputed*.

In addition (and as explained above), a plaintiff alleging a normal bad faith claim must show both "the absence of any reasonably legitimate or arguable reason" for the refusal to pay an insurance claim (i.e., "the absence of a debatable reason"), and "the insurer's actual knowledge of the absence of any legitimate or arguable reason." *See Brechbill*, 144 So. 3d at 257. But, here, no reasonable jury could find or infer the absence of a debatable reason or that Universal had actual knowledge of any such absence.

As explained above, the relevant insurance policy includes duties after loss provisions, based on which Universal was not required to provide coverage if the Harrises did not comply with the specified duties, including the duty to provide Universal with requested records and documents. Doc. 35-1 at 20. The Alabama Supreme Court has recognized the validity of such duties after loss provisions in

insurance contracts as conditions precedent to insurer liability.   *See Nationwide Ins. Co. v. Nilsen*, 745 So. 2d 264, 267 (Ala. 1998); *Hillery v. Allstate Indem. Co.*, 705 F. Supp. 2d 1343, 1362 (S.D. Ala. 2010) ("Courts have routinely upheld the validity of such 'duties after loss' provisions obliging an insured to furnish information and documents to the insurer.").   For instance, an insurer's "obligation to pay or to evaluate the validity of the claim does not arise until the insured has complied with the terms of the contract with respect to submitting claims," including terms requiring written proof of loss.   *United Ins. Co. of Am. v. Cope*, 630 So. 2d 407, 411 (Ala. 1993).

In this case, it is undisputed that—consistent with the duties after loss provisions in the relevant insurance policy—Universal repeatedly informed the Harrises that the Harrises would need to submit itemized estimates related to the expenses arising from the damage to their home before Universal would provide additional payment.   Doc. 36-4; Doc. 36-7; Doc. 35-2 at 16–17; Doc. 36-8; Doc. 36-10.   Likewise, it is undisputed that the Harrises did not provide the requested estimates with itemized costs for additional payment.   Doc. 35-2 at 12, 16–17; Doc. 36-8; Doc. 38-16.[10]

In sum, a jury may find that Universal breached its contract with the Harrises,

---

[10] Based on the record evidence, the Harrises also did not make a claim for ALE coverage.   Doc. 35-2 at 8–9; Doc. 39-3 at 12.

and it is not yet clear what damages the Harrises may claim at trial for any property damage that has arisen as the home has "deteriorate[d] more and more" since the flooding in May 2019.   *See* Doc. 39 at 6.

But, even construing the evidence and reasonable inferences in favor of the Harrises, the parties' disagreement about the amount owed, along with the undisputed fact that the Harrises did not submit itemized estimates for additional payment, means that no reasonable jury could find the "absence of a debatable reason" or that Universal had "actual knowledge" of the absence of a debatable reason.   *See Brechbill*, 144 So. 3d at 257.   As the Alabama Supreme Court has instructed, "[w]hen a claim is debatable, an insurance company is entitled to debate it."   *See Insurance Co. of N. Am. v. Citizensbank of Thomasville*, 491 So. 2d 880, 884 (Ala. 1986) ("There was a genuine dispute about the validity of the claims, and that dispute provided a debatable reason for denying coverage.").   Thus, the record shows a "reasonable ground for dispute" behind Universal's lack of additional payment, and the evidence cannot create a jury question on the Harrises' normal bad faith claim.   *Bowen*, 417 So. 2d at 183; *Brechbill*, 144 So. 3d at 258; *Insurance Co. of N. Am.*, 491 So. 2d at 884.

## II.     There is no triable issue of fact on the Harrises' abnormal bad faith claim.

On the Harrises' abnormal bad faith claim, there is no triable issue of fact for a jury.   As an initial matter, there can be no jury question on the Harrises' abnormal

bad faith claim because—as discussed above, *see supra* Part I—there is no genuine dispute of material fact about whether Universal "refused to pay the [Harrises'] claim" (*Simmons*, 791 So. 2d at 379), or about whether there was an "absence of legitimate reason for denial" (*Brechbill*, 144 So. 3d at 258).

Regardless (and as explained above), a plaintiff alleging an abnormal bad faith claim must show that "the insurer failed to properly investigate the claim or subject the results of the investigation to a cognitive review."   *Simmons*, 791 So. 2d at 379.

Construing the evidence in the Harrises' favor, no reasonable jury could find or infer bad faith based on Universal's alleged failure to properly investigate the claim.   As discussed above, Universal's adjuster (St. John) visited the relevant property less than a week after the reported damage, and submitted an itemized estimate for the Harrises' claim (Doc. 35-4 at 2); based on St. John's estimate, Universal made a payment to the Harrises (Doc. 35-2 at 10; Doc. 36-1; Doc. 36-2; Doc. 36-3).   Universal also made a second payment based on the estimates from the Harrises' contractor (Young).   Doc. 37-1; Doc. 36-14; Doc. 36-15; Doc. 35-2 at 10.

The undisputed record evidence shows that Universal then repeatedly requested that the Harrises submit itemized estimates and invoices with respect to the property damage, but the Harrises did not submit itemized requests for additional payment.   Doc. 36-4; Doc. 36-7; Doc. 35-2 at 16–17; Doc. 36-8; Doc. 36-10. Universal also notified the Harrises that Universal had "decided to reach a settlement

agreement," if the Harrises could submit a specific estimate from a general contractor for repairing the damage to the property.  Doc. 38-8.  And, after the Harrises had filed this lawsuit, Universal had another consultant expert (Artusio) inspect the damage and provide an itemized estimate for repairs.  Doc. 38-17.  Thus, in light of the record evidence, no jury reasonably could find or infer that Universal "*recklessly* or *intentionally* failed to properly investigate" the Harrises' insurance claim.  *Simmons*, 791 So. 2d at 381 (emphasis added).

In this respect, the Harrises assert that Universal acted in bad faith by not having one or more adjusters assess the property more frequently and/or sooner— i.e., after St. John had inspected the property and before Artusio did so.  Doc. 39 at 6–13.  But (as also explained above), an abnormal bad faith claim requires the plaintiff to show the defendant's "dishonest purpose" or "some motive of self-interest or ill will."  *Singleton*, 928 So. 2d at 283.

According to the Alabama Supreme Court, "more than bad judgment or negligence is required in a bad-faith action."  *Singleton*, 928 So. 2d at 286–87.  The undisputed record shows that in October 2019—5 months after St. John's estimate— Universal retained Hindman to provide a cost estimate, that in February 2020 Hindman said the report would be completed in 2 days, but that Universal never obtained any report from Hindman.  Doc. 37-15; Doc. 37-16; Doc. 38-3; Doc. 35-2 at 11.  And, it was shortly thereafter (in February 2020), that Universal

communicated to the Harrises the intention "to reach a settlement agreement."   Doc. 38-8.

While those undisputed facts appear strange, there is no evidence suggesting the necessary "dishonest purpose," "self-interest," or "ill will" (*Singleton*, 928 So. 2d at 283), and any finding in that regard would be speculative.   *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("unsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion," as "speculation does not create a *genuine* issue of fact" (emphasis in original; quotation marks omitted)).   At most, the record facts related to Hindman's having "ghosted" Universal might show "bad judgment" or "negligence," but nothing "more"—as is required to get an abnormal bad faith claim to a jury. *Singleton*, 928 So. 2d at 286–87.

As explained above, the undisputed record demonstrates both a disagreement between the parties about the amount that Universal owes the Harrises under the relevant insurance policy, and that the Harrises did not submit documents that Universal had requested.   Doc. 35-2 at 12; *see* Doc. 38-16.   Given the record evidence, this court has not identified any legal authority supporting the proposition that, without more, a jury could find or infer bad faith based on Universal's failure to send a hypothetical additional inspector/adjuster to investigate the cost of repairs. Nor have the Harrises identified any such legal authority.   As a result, the record

facts cannot create a jury question on the Harrises' abnormal bad faith claim.

## CONCLUSION

For the reasons stated above, the court **GRANTS** the partial summary judgment motion (Doc. 33), and **DISMISSES WITH PREJUDICE** the Plaintiff Harrises' claim for bad faith failure to pay and investigate (Count 6).

The court **SETS** this case for a telephone status conference on **Friday, March 24, 2023, at 1:00 PM**.   Ahead of that status conference, counsel are **ORDERED** to meet and confer regarding potential case resolution and trial scheduling.

**DONE** and **ORDERED** this March 10, 2023.

_____
 **NICHOLAS A. DANELLA**
 UNITED STATES MAGISTRATE JUDGE